I GAUDIN, Judge.
This is an appeal by Bunge Corporation from a January 20, 1995 district court judgment saying that grain held for export in Bunge’s grain elevator in Destrehan, Louisiana is subject to ad valorem taxes. We reverse, holding that grain held for export, despite some inconsequential cleaning and blending within the grain elevator, is nonetheless a raw material constitutionally exempt from ad valorem taxation.
Appellee is the tax assessor of St. Charles Parish, contending that grain in Bunge’s elevator was not being held only for export but that in fact the mixing or blending which took place in the elevator manufactured a substantially new and different grade of grain which could and should be taxed.
Bunge’s 34-acre facility in St. Charles Parish receives grain by rail and barge. Within the elevator, the bulk cargo is inspected, graded, aerated, cleaned and blended. The grain is then loaded onto ocean-going ships and 12sent to ports outside the United States. There is no off-loading at any American port. Average time lapse between receipt of grain and the loading onto ships is 24 to 72 hours.
Article 7, Section 21(D)(2) of the Louisiana Constitution of 1974 exempts from ad valo-rem taxation any and all grain held for export to points outside the Continental United States. Included among property exempt from ad valorem taxation are:
“Raw materials, goods, commodities, and other articles being held on the public property of a port authority, on docks of any common carrier, or in a warehouse, grain elevator, dock, wharf, or public storage facility in this state for export to a point outside the states of the United States.”
Believing that Bunge was not entitled to this exemption once cleaning and blending occurred, the St. Charles assessor placed a value on the grain held in Bunge’s elevator during the 1992 tax year and then sent Bunge a tax bill. Bunge appealed the assessment to the St. Charles Parish Board of Review, which agreed with the assessor. Bunge appealed to the Tax Commission of the State of Louisiana. Before the Tax Commission, the parties entered into a stipulation which explains in precise detail what goes on in this and other grain elevators. The stipulation, in pertinent part reads:
“The only item of property belonging to Bunge Corporation that has been assessed *1181 by the St. Charles Parish Assessor for which Bunge is appealing the decision of the St. Charles Parish Board of Review is grain located at a grain elevator facility (the “Facility”) located ... in Destrehan. The grain consists of wheat, sorghum, corn and soybeans. Various grades and qualities exist within a general descriptive category of grain.
“The Facility is one of ten export grain elevators located in Louisiana and exported approximately 106 million bushels of grain during the calendar year ... The Facility, which is adjoined by a soybean processing plant, received the grain by barge and by rail in the form of bulk cargo. The grain was inspected, temporarily stored, sometimes aerated, typically blended, sometimes cleaned, sometimes dried, graded, and then loaded at the Facility aboard ocean-going vessels ...
| ¡¡“The sequence of the processing of the grain was inspection, storage, aeration (as required), drying (as required), blending, cleaning and grading. Inspection consisted of selecting a representative sample of the grain in each lot to determine qualities such as test weight, the extent of damaged kernels and foreign material in each lot, and moisture content.
“After the grain was inspected, the grain was transported by conveyors and bucket elevators to storage silos within the Facility-
“After inspection, amounts of the grain from different storage silos were then blended at the Facility by releasing the grain onto basement conveyors, which transported the grain to bucket elevators in the Facility. The bucket elevators lifted the grain vertically through structures known as headhouse legs and then discharged the grain either into cleaner or into a scale hopper at the Facility. The blending was achieved by transporting selected amounts of the grain having different qualities on the conveyors and in the bucket elevators, which causes the grain to become mixed. All of the grain was blended.
“A portion of the grain was cleaned at the Facility by circulating such grain though a cleaner, which removed foreign material and damaged or small kernels from the grain by sifting the grain over an inclined screen. The particles that fell through the screen (which are known as ‘screenings’) were separated and the remaining grain was discharged into a scale. The portion of the grain that was not cleaned bypassed the cleaning process and was discharged into a scale after blending. After being discharged into a scale, the grain, whether cleaned or not, was sampled and then discharged into a bin at the Facility where the grain was inspected by the United States Department of Agriculture and assigned a grade in accordance with its attributes and per the United States Department of Agriculture grain standards.
“A small portion of the grain was dried by circulating such grain through a dryer, which reduced the moisture content of the grain by blowing hot air on the grain.
“None of the grain was polished; milled; ground; mixed (other than the blending process described above) with any other ingredient, product, or catalyst; cooked; or packaged at the Facility.
“Immediately after processing at the Facility, all of the grain (excluding any screenings, which were essentially a waste product and ineligible for export because screenings do not meet the grade requirements of the United States Department of Agriculture) was exported in the form of bulk cargo to points outside the United States and none was sold within Louisiana or the United States. The total screenings sold by Taxpayer at the |4Facility was approximately 315,700 bushels, which constituted less than 0.3% of the grain.
“Each of the other nine export grain elevators in Louisiana receives, processes, and ships grain in substantially the same way as described above and most have done so continuously for many years beginning prior to 1974, the year in which the current Louisiana Constitution became effective.
“Under § 75(v) of the United States Grain Standards Act (7 U.S.C. § 71, et seq.), the Facility constitutes an ‘export *1182 elevator,’ which is defined as any grain elevator, warehouse, or other storage or handling facility in the United States as determined by the Administrator, from which grain is shipped from the United States to an area outside thereof.
“Section 77 of the United States Grain Standards Act (which was effective in 1974) prohibits (with certain exceptions not relevant here) the shipment of any lot of grain from any export elevator to any place outside of the United States unless such lot is officially weighed, officially inspected, and assigned an official United States Department of Agriculture grade designation.
“All export grain elevators in Louisiana process grain in substantially the same was a described above for the Facility, and there are no grain elevators in Louisiana from which grain is exported that do not process grain in essentially the same manner as the Facility.
“Portions of the facility are exempt from ad valorem tax in St. Charles Parish for a ten year period under 1974 Louisiana Constitution Article VII, § 21(F) by virtue of its being classified as a ‘manufacturing establishment.’ ”
On February 3, 1993, the three-member Tax Commission ruled in favor of Bunge. In its judgment, the Tax Commission cited an Attorney General opinion dated November 13, 1974 saying unequivocally that grain held for export, although “improved” while in the elevator, was tax exempt. The decree, in part, states:
“It is my opinion that when the State Board of Commerce and Industry, with the approval of the Governor, granted tax exemptions to export grain elevators under the provisions of ... the Louisiana Constitution, it acted within the law and did not abuse its discretion in administering the constitutional provisions.
¡s“The fact that the grain, while held in the elevator for export, may have been improved by the elevator as to quality and grade does not render that grain which is ultimately exported to a point outside of the continental United States, subject to ad valorem taxes.
“The owners of grain ship it to the elevator either to meet existing sales obligations to foreign buyers or to hold the grain until sold to a foreign buyer. The fact that when delivered to the ocean carrier for export in fulfillment of a sales contract the grain originally received has been improved by the elevator does not negate the fact that it has been placed into the elevator to be held for export outside of the United States. Under these circumstances, I believe that under the above-quoted section of the Constitution, such grain is exempt from ad valorem taxes.”
The Tax Commission’s judgment concluded with this paragraph:
“Applying its experience, technical competence, and specialized knowledge, the Commission holds that the grain being held in a grain elevator for export is exempt from ad valorem taxation.”
In the record are several earlier (than 1974) opinions of the Attorney General, including one that said that elevator grain could be taxed. The November 13, 1974 opinion, however, evidently was accepted by grain elevator owners and Louisiana assessors as binding and authoritative. Until the St. Charles assessor attempted recently to impose ad valorem taxes on grain in an elevator, no other assessor had tried to do this.
The Attorney General opinion saying elevator grain could be taxed is dated September 19, 1973. This unnumbered opinion was requested by the St. Charles assessor and was signed by an assistant attorney general. The November 13, 1974 opinion, overruling the September 19, 1973 opinion, was signed by the Attorney General.
The assessor’s appeal of the Tax Commission’s ruling to the 29th Judicial District Court was submitted by and on briefs. In its judgment setting aside the Tax Commission’s decree, the trial judge said that “... the grain originally delivered to the Destrehan facility is not the same grain which 16eventually leaves the Destrehan facility.” Further, the trial judge noted that Bunge had filed for and received a 10-year manufacturing tax exemption. “Logically,” the trial judge said, “Bunge can’t have it both ways.”
*1183 On appeal to this Court, Bunge assigned two district court errors:
(1) the trial court failed to apply the correct standard when reviewing the decision of the Tax Commission, and
(2) the trial court wrongly found that grain held in Bunge’s elevator was not constitutionally exempt from ad valorem taxes.
We find merit in both assertions. Regarding (1) above, judicial review of Tax Commission rulings are governed by LSA-R.S. 49:964(G). The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other errors or law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(6) Manifestly erroneous in view of the reliable, probative, and substantial evidence on the whole record. In the application of the rule, where the agency has the opportunity to judge of the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency’s determination of credibility issues.
The trial judge did not say that the Tax Commission’s decision was in violation of any of the R.S. 49:964(G) provisions. It does not appear, from |7the record, that the Tax Commission’s findings were wrong, much less manifestly erroneous. In reviewing decisions of the Tax Commission, district courts must use the manifest error test. See Broussard v. Louisiana Tax Commission, 614 So.2d 1341 (La.App. 3 Cir.1993); also Holiday Bossier Ltd., v. Tax Commission, 574 So.2d 1280 (La.App. 2 Cir.1991), writs denied at 578 So.2d 136 (La.1991).
When an administrative agency as the Louisiana Tax Commission is the trier of fact, as the courts said in the Broussard and Holiday Bossier cases, a reviewing court will not reevaluate evidence before such body except for purpose of determining (1) whether the hearing was conducted in accordance with authority and formalities of statute, (2) whether findings of fact were supported by substantial evidence and (3) whether the body’s conclusions from such findings were arbitrary or constituted an abuse of discretion. The trial judge here did not say that the hearing before this Tax Commission was improper in any way or that the findings of fact were not sufficiently supported by testimony and evidence; likewise, he did not say that the commission’s conclusions were arbitrary or that the commission abused its discretion. Perhaps the main reason for the district court judgment could be the trial judge’s proclamation that Bunge “... can’t have it both ways.”
Bunge contends that it can, at the same time, have a 10-year manufacturing tax exemption on the grain elevator itself and a constitutional tax exemption on contents (grain) being held for export. This issue, however, was neither before the Tax Commission nor the district court and is not now before this Court. Courts are and should be reluctant to address issues, particularly issues of a possible constitutional nature, unless required to do so. See Matheme v. Gray Ins. Co., 661 So.2d 432 (La.1995).
|8The only issue relative to this litigation, notwithstanding the stipulation that “portions” of Bunge’s facility were covered by the 10-year exemption given to manufacturers, is whether grain held in Bunge’s elevator was subject to an ad valorem tax.
The St. Charles assessor argues that the word “held” must be given a limited scope and that grain being “held” can only be loaded, unloaded or accumulated, as provided for in LSA-R.S. 47:1951.2.[1] While the grain *1184 is being mixed or blended, he contends, it is not in transit, i.e., not in the stream of export commerce, and is not being “held” as far as the tax exemption is concerned. Instead, a new and different product is being manufactured. The assessor labels Bunge’s grain elevator a “multi-purpose facility.”
From the record and from the stipulated facts, we know that all of the incoming wheat, sorghum, corn and soybeans is placed in and processed through the grain elevator. No grain is off-loaded from trains or barges directly onto ocean-going ships. In fact, very little if any incoming grain can be exported without some treatment in the elevator. Federal inspectors assign a grade, from one (highest quality) to five (lowest quality). The grain is then placed in storage silos according to grade. Thereafter, the grain is aerated (forced air eliminates odors and inhibits mold formation), cleaned (small pieces and foreign matters are filtered out), dried (moisture is Igremoved) and blended (various grades are combined, resulting in grain which meets certain customer specifications).
Grain is not polished, milled, ground, cooked or put in boxes or packages. Grain in Louisiana’s 10 grain elevators, according to the stipulations, has been received and processed in substantially the same way “... continuously for many years beginning prior to 1974 ...”
Grain held for export outside the continental United States was also exempt under the Louisiana Constitution of 1921, which used language virtually identical to that incorporated in the 1974 Constitution. Article 10, Section 4(19)(b) of the 1921 Constitution, which exempts elevator grain held for export from ad valorem taxes, was adopted as a constitutional amendment in 1960. It must be presumed that legislators in 1960 and delegates to the Constitutional Convention in 1974, as well as the Attorney General in November of 1974, knew what went on in every grain elevator in this state. What was being done before 1960, what was being done in 1974 and what is being done now is exactly the same thing. There is some cleaning and mixing but the raw product remains. It seems clear that the intent of the 1960 amendment and the wording in the 1974 Constitution was to exempt grain held in elevators, although insignificantly cleaned and blended, from ad valorem taxation, as correctly determined by the Tax Commission.
Finally, we note this. The export exemption in question does not include any “in transit” language, meaning that grain qualifying for the tax exemption can be held in elevators and does not have to be actually moving, as on a train or barge. The terms “in transit” and “moving in interstate commerce” are conspicuously present in other sections of the 1974 Constitution but not in Article 7, Section 2(D)(2).
lioWe set aside the district court judgment dated January 20,1995 and reinstate the Tax Commission opinion dated February 3, 1993. Each party is to bear his or its costs of this appeal.
DISTRICT COURT JUDGMENT REVERSED. OPINION OF TAX COMMISSION REINSTATED.

. LSA-R.S. 47:1951.2 provides:
"For the purpose of ad valorem taxation, raw materials, goods, commodities and other articles *1184 held in this state for the purpose of being exported from this state to a point outside the continental United States, shall be regarded as severed from the mass of the property of this state from and after the time the same are placed upon the public property of a port authority or docks of any common carrier, or in a warehouse, grain elevator, dock, wharf, or other public storage facility in which same are being loaded, unloaded, or accumulated, while being so exported.”